MAMIE CULLEN and KATE CULLEN v. ADAMANTINE JOHNSON, Appellant.—29 S. W. (2d) 39.

Division One, June 3, 1930.

*W. E. Mitchell* and *Henry B. Hunt* for appellant.

*John C. Landis, Jr.,* and *Mayer, Conkling & Sprague* for respondents.

SEDDON, C.—This action, which is brought under Section 1970, Revised Statutes 1919, to ascertain, determine and quiet the title to real estate, was commenced on July 19, 1920, in the Circuit Court of Atchison County. The petition alleges that plaintiffs are the owners in fee of the north half of Section 16, and the south half of Section 9, all in Township 65, Range 42, in Atchison County; that the defendant, Adamantine Johnson, claims to be the owner in fee of said described land, but in truth and in fact has no rightful claim to any part of the described land; wherefore, the plaintiffs pray the court to ascertain and determine the estate, title and interest of the plaintiffs and the defendant in said real estate, and to define and adjudge the title, estate and interest of the parties therein, and to adjudge the title in fee to said land to be in the plaintiffs.

The defendant, Adamantine Johnson, by amended answer, denies generally all of the allegations of the petition; avers that plaintiffs claim to own the described land as accretions to certain deeded lands lying along the east high bank of the Missouri River in Atchison County, which lands had been conveyed to plaintiffs by quitclaim deed made and executed by certain riparian owners therein named, but that said quitclaim deed does not effectually convey any lands to plaintiffs, for the reason that said deed fails to describe definitely any of the lands purporting to be conveyed; avers that the lands described in plaintiffs' petition are not accretions to the high bank lands lying along the east shore line of the Missouri River, but are lands which are an integral part of an island which formed in the Missouri River on the east side of the center of the main channel of said river, in Atchison County, Missouri; that said island was formed prior to April 8, 1895, and was for many years entirely surrounded by the waters of the river, flowing around said island, and flowing between said island and the east bank of the river; that there were accretions to said island, from time to time, until it be-

came a large body of land capable of being used for agricultural purposes; that said island was granted by the State of Missouri to Atchison County under the provisions of Article 6, Chapter 56, Revised Statutes 1919 (Secs. 7029-7043), the same being an act of the General Assembly of Missouri, approved on April 8, 1895, and amended in 1899; that defendant went upon said island in the years 1897 or 1898, and took possession of all the lands described in plaintiffs' petition, and has been in actual, open, notorious, continuous, exclusive, uninterrupted, adverse, and peaceable possession of said lands for a period of more than ten years consecutively, and for twenty-two years prior to the commencement of the present suit, and that plaintiffs' action is barred by the ten-year Statute of Limitation; that Atchison County brought a suit against defendant in the year 1914 for all of the said land lying in Section 9, Township 65, Range 42, wherein, by agreement of the parties to said suit, Atchison County took a judgment against defendant for the whole of said land; that defendant, in order to purchase his peace, had purchased all of the land described in plaintiffs' petition from Atchison County on February 7, 1918, at the price and sum of one dollar and twenty-five cents per acre, and had paid to the County Court of Atchison County the sum of $800 in cash for said land; that the County Court of Atchison County, on February 7, 1918, had made, executed and delivered to defendant a good and sufficient quitclaim deed conveying the described land to defendant; and that plaintiffs and their immediate grantors are barred by laches from maintaining the present action by reason of having slept on their rights for a period of twenty-two years prior to the commencement of the present action, well knowing of defendant's acts of possession and claim of exclusive ownership of said land, and of the purchase of said land by defendant from Atchison County at and for the sum of $800, and having allowed and permitted the defendant to make valuable improvements, build fences, out-buildings and a dwelling house thereon, and to clear and cultivate said land, and to pay taxes thereon; wherefore, defendant prays the court to ascertain and determine the estates, title and interests of the respective parties in and to the land described in plaintiffs' petition, and that defendant be adjudged to be the sole and exclusive owner thereof.

No reply is shown by the record to have been filed by the plaintiffs, but the action was tried as though a reply had been filed, denying generally the several averments of the answer.

The venue of the action was twice changed, first to the Circuit Court of Holt County, and then to the Circuit Court of Andrew County, where the cause was tried during the February, 1926, term of that court.

A trial of the equitable issue of laches, tendered by defendant's answer, was first had before the court, without the aid of a jury. After hearing evidence upon that issue, the trial court made and entered a finding in favor of the plaintiffs, and against the defendant, upon the equitable issue of laches. Thereupon, *"by agreement of the parties"* (the record so recites), the issue of the manner of formation of said land and the ownership thereof was tried and submitted to a jury, resulting in a unanimous verdict of the jury that the plaintiffs are the owners of, and have title to, the land described in plaintiffs' petition, and that the defendant has no right, title or interest in said land, or any part thereof. The trial court entered a judgment in conformity with the verdict, and, after an unsuccessful motion for a new trial, the defendant was allowed an appeal to this court.

The evidence adduced by plaintiffs tended to show that a survey of the vicinity was made by the United States Government in the year 1846, at which time the east bank of the Missouri River extended in a southeasterly direction across the northwest quarter and the southeast quarter of Section 9, and across the west half of Section 15, and the south half of Section 16, all in Township 65, Range 42. Lying approximately one mile west of the east bank of the Missouri River was a large island, known as Kauffman's Island, which island lay wholly within the State of Nebraska. The main channel of the Missouri River flowed between Kauffman's Island and the east shore line of the river, at the time of the Government survey of 1846. The present boundary line between the states of Missouri and Nebraska extends along the northerly and easterly sides of Kauffman's island. The land in controversy lies between the easterly shore line of Kauffman's Island and the so-called easterly "high bank" of the Missouri River, which "high bank" marks the extreme easterly line, or limit, of erosion of the Missouri River, and meanders in a semi-circular direction through parts of Sections 4, 5, 6, 9, 10 and 15, of Township 65, Range 42. A small corner of the northeast quarter of the northeast quarter of Section 16, and a considerable part of the southeast quarter of Section 9, were included in the Government survey of 1846. In 1882 or 1883, the waters of the main channel of the Missouri River, which at that time flowed between Kauffman's Island and the east bank of the river as shown in the Government survey of 1846, began to cut into the east bank of the river, and by gradual erosion over a period of ten or more years the river cut and washed away the land lying to the north and east, so that the east bank of the river was gradually extended northerly and easterly until it reached the irregular and semi-circular line presently known as the east "high bank" line. The period of erosion continued until about the year 1893, during which period.

according to plaintiffs' evidence, the most of Section 9, all of Section 16, and portions of the west half of Sections 10 and 15, were completely cut and washed away by the river, and the main channel of the river was flowing immediately against the east "high bank" line. About the year 1893, the Missouri River ceased eroding the east "high bank," and the waters of the main channel of the river began to recede gradually and imperceptibly in a southerly and westerly direction. This recession of the waters of the river extended over a period of two or more years, so that the recession was gradual and imperceptible, and was not the result of any sudden avulsion. As one of plaintiffs' witnesses expressed it: "An eddy formed on the Missouri side of the channel. I think that was about 1892. That threw the stream back to the west. The eddy formed right up against the bank up here. The water then just shot off and began going down this chute. When it began cutting on the head of Kauffman Island that drew the channel away from the bank line, and it began to come back to the place where the state line is now, *and as it came back it filled in behind it.* It would keep working toward the Nebraska side *and filling in on the Missouri side.* . . . The channel of the Missouri River which cut in to the east *filled to the Missouri side* and was cutting off on the Nebraska side going west until it left this bend; and the last place of the river was here on the east side of Kauffman Island. The channel of the Missouri flowed along the east side of Kauffman Island probably two or three years after it quit cutting along the east bank. . . . I know where the state line is between Missouri and Nebraska. This is it, that there last known channel east of Kauffman Island." The evidence on behalf of plaintiffs further tends to show that, as the waters of the river gradually receded to the south and west, toward the east side of Kauffman's Island, a sand bar formed against the east "high bank," and the bar was gradually extended farther to the west and south. As one of plaintiffs' witnesses expressed it: "The water quit flowing around the high bank next to the Missouri shore. That was in '91 or '92. As the channel died, the river went away from the high bank to the west, and a sand bar formed behind it as it went away, and *it kept filling in along the bank as the river went out.*" Plaintiffs' evidence further tended to show that silt, sediment, and alluvium were deposited upon, and lodged against, the sand bar which formed against the east "high bank," so that the bar gradually grew in area and in height, and that rushes, brush, willows and trees took root in the soil of the bar and grew for a period of more than twenty years, so that, at the time of the trial, there were some trees upon the bar which were of considerable size. As the bar gradually grew in size, it was extended toward the west until it completely closed the channel between Kauffman's

Island and the old east shore line, or "high bank," of the river, and became joined to the east side of Kauffman's Island, after which the waters of the main channel of the Missouri River flowed entirely on the west side of Kauffman's Island. Several witnesses testified that no water has flowed along the east "high bank" of the river since 1893 or 1894, except during the floods of 1903 and 1917, at which times the bar was partially covered by the flood waters of those years. The land in controversy is a part of the old bar as described in the testimony of plaintiffs' witnesses.

On July 13, 1918, the several individual owners of riparian lands abutting on the old east "high bank" of the Missouri River commenced four separate actions to quiet title to portions of the land here in controversy, claiming title thereto as accretions to the deeded lands owned by the respective plaintiffs in those actions. The several actions were brought against Atchison County and Adamantine Johnson (the defendant in the case at bar) as codefendants. Thereafter, the several plaintiffs in those separate actions conveyed the lands now in controversy, by quitclaim deed, to the plaintiffs in the present action, the purpose of such conveyance being to avoid a multiplicity of suits, and to enable the plaintiffs to prosecute a single action to ascertain, determine, and quiet the title to the land here in controversy. The several actions which had been so commenced were dismissed on March 2, 1920, and the present action was commenced by the plaintiffs on July 19, 1920. It was admitted by the parties, upon the trial of the present action, that plaintiffs have record or paper title to all of the shore lands lying east of, and adjoining, the old "high bank," which shore lands are contiguous to the described land in controversy.

The defendant adduced evidence tending to show that the land in controversy was originally formed in the Missouri River as an island, lying between Kauffman's Island, on the west, and the easterly shore line of the river, and that the island gradually grew by accretion until it joined the east shore line. Defendant testified that he was a physician and surgeon, and that he had practiced his profession from 1877 until 1898; that he came to the town of Watson, in the vicinity of the land in controversy, in the spring of 1881; that he first saw the island in 1881; that, in 1881, the east side of the island was about a half mile distant from the east shore line of the river; that the area of the island (in 1881) was 800 to 1000 acres, and that there was then growing timber on the island; that the island was entirely surrounded by the waters of the Missouri River from 1881 to 1898; that defendant went over to the island in 1898 and bought a "little shack" from one Tom Hays, for which "shack" defendant paid Hays $62; that defendant lived, at intervals, on the island for several years after 1898, but that he kept and maintained his home

in the town of Watson, where he had lived with his daughter for twenty-five or twenty-six years; that the "shack" was blown away by a cyclone, and a small barn which defendant had built on the island was washed away by the river; that defendant built a small house of cottonwood logs in the year 1915, and cleared and fenced part of the island, and pastured stock thereon; that he sowed part of the island in blue grass; that he farmed the island after 1918, and had about 150 acres of the island sowed in corn, wheat and grass; that he owned a drug store in the town of Watson, which business he personally conducted until 1920 or 1921, when he sold the drug store; that the island was generally known in the vicinity as Johnson's Island; that Johnson's Island was a mile in length and a half mile wide in 1898, and contained more than 1000 acres, and there were trees then growing on the island having a diameter of six or eight inches, and the main channel of the Missouri River was then on the east side of Johnson's Island; and that the channel of the river ceased flowing on the east side of the island in 1903 or 1904.

It appears from the evidence that, in the year 1914, Atchison County, as plaintiff, commenced a suit against Adamantine Johnson, as defendant, seeking to quiet the title to the south half of Section 9, Township 65, Range 42 (the same being the north half of the land here in controversy), which suit resulted in a judgment being entered on May 30, 1914, in favor of Atchison County, wherein it was adjudged that Adamantine Johnson had no right, title or interest in said land, and he was perpetually enjoined from asserting, in any manner, any right, title or interest therein. Thereafter, on February 7, 1918, the defendant, Adamantine Johnson, paid to Atchison County the sum of $800, in consideration of which he received from the said county a quitclaim deed purporting to convey to defendant all of the land here in controversy, which deed was duly filed for record on February 7, 1918. The following testimony of the defendant, Adamantine Johnson, given on May 18, 1922, in the trial of another and different action, was offered in evidence in the present action, as an admission of defendant against interest: "Q. You are only claiming the north half of (Section) 9? A. I am claiming what I bought. Q. Doctor, you abandoned all your claims, did you not? A. I did when I bought. Q. You abandoned all claims? A. Except that I bought from the county. Q. And so the only claim you have is the claim you acquired from the county when you bought it? A. Yes, that is all. I claim now the south half of (Section) 9 and the north half of (Section) 16."

The evidence on behalf of defendant further shows that, in the fall of 1919, the defendant built a four-room frame house upon the land in controversy, at a cost of $2250, and thereafter fenced a considerable part of the land. He also caused the land to be assessed

for taxation in the year 1919, and paid the taxes, amounting to $3.95, levied for that year, and has paid the taxes thereon from that date until the trial of the present action in February, 1926. A number of witnesses on behalf of defendant testified to having measured with a tape-line the size of some of the cottonwood trees growing upon the land in controversy, and that some of the cottonwood trees were seven to eight feet in circumference, and two and a half feet in diameter. A number of photographs were introduced in evidence by defendant for the purpose of showing the size of the timber growing upon the land in controversy, and indicating the extent to which the land was being cultivated by defendant at the time of the trial of the action.

I. Appellant assigns error in the adverse finding and ruling of the trial court upon the issue of laches presented by defendant's answer. Notwithstanding that the trial court, sitting as a chancellor, tried such issue as one in equity, the respondents insistently urge that such issue has no proper place in the present action, which is purely an action at law, and that the defendant's plea of laches constitutes no defense or bar to plaintiffs' action at law.

The instant action is brought under the statute (Sec. 1970, R. S. 1919) to quiet title to land, based on the plaintiffs' claim of the ownership of said land in fee, and is purely an action at law, unless an equitable issue as to the ownership of the land is tendered by the defendant's answer. [Dumm v. Cole County, 315 Mo. 568, 574; Lee v. Conran, 213 Mo. 404, 413; Cullen v. Atchison County, 268 S. W. 93, 95.] Laches is peculiarly a defense to an equitable claim or cause of action, and has no place as a defense to an action at law, or to an action wherein plaintiff stands upon a claim of legal title. [Hecker v. Bleish, 319 Mo. 149, 172; Willis v. Robinson, 291 Mo. 650, 675; Brooks v. Roberts, 281 Mo. 551, 558; Bell v. George, 275 Mo. 17, 30; Kellogg v. Moore, 271 Mo. 189, 193; Chilton v. Nickey, 261 Mo. 232, 243; Hayes v. Schall, 229 Mo. 114, 124.] It is plain from the allegations of the petition herein that plaintiffs ground their cause of action wholly and solely upon a claim of a legal, as distinguished from an equitable, title to the land in controversy; and, under the prior announcements of this court, the plaintiffs cannot be divested of their legal title by the application of the equitable doctrine of laches. [Bell v. George, 275 Mo. 1. c. 30, and cases there cited.] Looking to defendant's answer, we find no equitable issue therein tendered as respects the *title and ownership* of the land in controversy. Defendant, by his answer, claims a legal title in fee to the land in controversy, based upon the ground that the land is of island formation, and, therefore, that the legal title

to said land was vested in the State of Missouri, prior to April 8, 1895, as a part of the public domain, and that the State, by virtue of the statute enacted on April 8, 1895 (Secs. 7029-7043, R. S. 1919), granted and transferred the legal title in said land to Atchison County, and that the said county, on February 7, 1918, had sold and conveyed the legal title in said land to defendant. While defendant's answer attempts to set up the laches of the plaintiffs as an equitable defense, the answer does not pray any affirmative equitable relief. The prayer of the answer is that the court shall "try, ascertain and determine the estates, title and interests of plaintiffs and defendant of, in and to the said real estate described in plaintiffs' petition, and . . . adjudge, determine, settle, quiet and define the respective rights, titles, interests and estates of plaintiffs and defendant to said real property; and . . . that the court find that he (defendant) is the sole owner of the real estate described in plaintiffs' petition, and that an order and decree be entered of record forever barring and precluding the plaintiffs, and each of them, as well as all persons claiming by, through or under plaintiffs, from hereafter setting up any title or claim to said real property; and for all other proper orders and relief in the premises."

Such a prayer does not constitute a prayer for affirmative equitable relief, but merely asks for an ascertainment and determination of the legal title—that is to say, which party, plaintiffs or defendant, is vested with the legal title in the land which is the subject-matter of the action. [Koehler v. Rowland, 275 Mo. 573, 582; Newbrough v. Moore (Mo. Sup.), 202 S. W. 547, 549, 551.] The mere setting up of an equitable defense in the answer does not convert an action at law into a proceeding in equity unless affirmative equitable relief is prayed. [Koehler v. Rowland, 275 Mo. 573, 581, and cases there cited.] We are of opinion that the equitable plea of laches, as set forth in defendant's answer, does not constitute a defense or bar to plaintiffs' action at law, and that such plea, being unaccompanied by any prayer for affirmative equitable relief, does not convert the instant action at law into one in equity.

But, if the so-called plea of laches can be taken and considered as a plea of estoppel *in pais*, nevertheless, we think that the evidence is insufficient to support the plea of estoppel. We have given close study and consideration to the evidence adduced by defendant in support of the plea, and we find no substantial evidence that defendant was caused to make any expenditures in improving the land in controversy, or to do any other act to his injury, by reason of any delay or inaction of the plaintiffs, or their grantors. So far as the evidence discloses, the defendant occasionally lived on the large body of land (which defendant is pleased to call "John-

son's Island") as a mere squatter, prior to February 7, 1918, when defendant purported to acquire color of title from Atchison County. While defendant testified that the "island" included more than 1000 acres in area, when he first commenced to live upon the "island" in 1898, there is no clear or convincing evidence that he made any substantial improvements upon the 640 acres of land here in controversy until after he had acquired a quitclaim deed thereto from Atchison County, in February, 1918. The evidence discloses that, in 1898, defendant purchased a cheap "shack" from one Hays for $62, which, according to the testimony of one of defendant's witnesses, "was a log shack in the sand, pretty well covered up in the sand, and pretty well to the northwest of the island." There is no evidence that the log "shack" was located upon the 640 acres of land here in controversy. Sometime thereafter defendant built a small barn upon some part of the so-called "island," but the barn was washed away by the encroaching waters of the Missouri River, and the log "shack" was blown away by a cyclone. The defendant pastured cattle and other live stock upon the "island," but, according to defendant's evidence, "they ran all over the land; they just wandered where they found something to eat; my cattle ranged backward and forward over 1000 acres." According to defendant's testimony, he had cleared about eighty acres of land in 1912, and had cleared, and was cultivating, about 150 acres of land in 1918, but the evidence is hazy and vague respecting the location and description of the cleared land, and none of the cleared and cultivated land is clearly or certainly shown to have been embraced within the 640 acres of land here in controversy. The defendant testified that he had built some fences upon the "island," but he testified further that he did not remember the years when the fences were built, and we find no substantial evidence in the record that any part of the land in controversy was fenced until the year 1917, shortly before defendant acquired (in February, 1918) the quitclaim deed from Atchison County, purporting to convey to defendant the 640 acres of land in controversy. Defendant, according to his testimony, built a four-room frame house, costing $2250, upon the south half of Section 9, in the year 1919, "about a year after I bought the land." The house was built by defendant, however, after the plaintiffs' grantors had commenced (in 1918) their several actions to quiet the title to portions of the land in controversy, and while those actions were pending in the Circuit Court of Atchison County. The evidence of plaintiffs was to the effect that Adamantine Johnson (defendant herein) was made a party defendant to those actions, and was served with process therein in August, 1918, and he responded to the process served upon him and filed answer in each of said actions. It is therefore indisputable that defendant had actual, as

well as constructive, notice of the claims of plaintiffs' grantors to the land in controversy prior to the building of the four-room house upon the land in 1919. Defendant paid no taxes upon the land in controversy until the year 1919, at which time he had notice of the claims of plaintiffs' grantors by reason of the commencement (in 1918) of the several suits to quiet title brought against the defendant and his grantor, Atchison County. Thus, it appears from the evidence of defendant that he suffered no real or substantial injury by reason of any laches or delay upon the part of plaintiffs, or their grantors, in asserting their claims to the land now in controversy. Mere delay is not laches; laches is delay or inaction on the part of one individual that works to the disadvantage or injury of another. [Carlin v. Bacon, 16 S. W. (2d) 46, 49; Johnson v. Antry, 5 S. W. (2d) 405, 409; Parish v. Casnei, 282 S. W. 392, 409; Davies v. Keiser, 297 Mo. 1, 16; Lindell Real Estate Co. v. Lindell, 142 Mo. 61, 79.] Nor does the delay or inaction of plaintiffs, or their grantors; in so far as the evidence herein discloses, amount to estoppel *in pais,* so as to constitute a bar to plaintiff's action at law. [Bell v. George, 275 Mo. 17, 32; Kellogg v. Moore, 271 Mo. 189, 194; Carson v. Lumber Co., 270 Mo. 238, 244.] The trial court committed no error in finding for plaintiffs upon the issue of laches tendered by defendant's answer, and appellant's assignment of error respecting the ruling of the trial court upon that issue is denied.

II. Appellant assigns error in the refusal of the trial court to give to the jury the defendant's peremptory instruction in the nature of a demurrer to the evidence, which peremptory instruction was requested at the close of all the evidence. Appellant takes the position that the plea of laches, presented by the answer, converted the instant action into one in equity, triable by the court sitting as a chancellor, and that the verdict of the jury was merely advisory, and was not binding upon the trial court. Wherefore, appellant insists that the finding or verdict of the jury is not conclusive and binding upon this court on appeal, and that we should review the whole evidence, pass upon its weight and credibility, and determine for ourselves the right and equities of the matters in issue. As we have held in Paragraph I of this opinion, the instant action is purely one at law, wherein the legal title and ownership of the land in controversy was the sole issue, and inasmuch as the answer prayed no affirmative equitable relief, the answer was insufficient to convert the legal action into an equitable action. Hence, the verdict of the jury herein is conclusive and binding upon this court on appeal, provided, of course, that there is substantial evidence to support the verdict, and absent any procedural error committed by the trial court. [Dumm v. Cole

County, 315 Mo. 568, 574; Cullen v. Atchison County, 268 S. W. 93, 95.]

We are unable to say that there is no substantial evidence upon which to predicate the verdict and finding of the jury herein, and therefore we are not justified in disturbing such verdict and finding. It is true that there is a sharp conflict in the evidence respecting the manner of the formation of the land in controversy; but the evidence adduced by plaintiffs tends rather strongly to show that the land in controversy accreted to the shore lands of the riparian owners from whom plaintiffs deraign title, while the evidence adduced by defendant tends as strongly, perhaps, to show that the land in controversy is of island formation, or accretions to such island. The question or issue of the manner of formation of certain lands in Sections 10 and 15 (immediately adjoining the lands here in controversy) was before this court in the case of Griswold v. Hall, 191 S. W. 1011, wherein we refused to disturb or set aside the verdict and finding of a jury that the land there in controversy was not of island formation, but was formed by accretion or reliction to the shore line of the respondent's land. The later case of Cullen v. Atchison County, 268 S. W. 93, involved the title to a large body of land of which the land now in controversy was a part, and this court again refused to disturb the finding and verdict of a jury that the land was not of island formation, but was formed by accretion or reliction to the shore lands of the riparian owners. In the case last cited, we said (268 S. W. 1. c. 95): "There was abundant, substantial evidence offered at the trial, which justified the verdict of the jury returned in this case. Substantially the same issues as are presented here on the merits were passed on by at least two juries and two judges of the circuit court. One of these cases, entitled Griswold v. Hall (Mo. Sup.), 191 S. W. 1. c. 1011, and following, was appealed to this court, and the judgment in favor of defendant, Hall, affirmed. It was the province of the jury to pass upon the weight of the testimony, and we do not feel justified, on the record before us, in disturbing the same upon a demurrer to the evidence."

It is urged by appellant, however, that the verdict of the jury is against the physical facts in evidence, and, therefore, that the verdict should be disregarded and set aside as a matter of law. While appellant does not point us to the "physical facts" which he claims to be irreconcilable with the verdict and finding of the jury, we assume that appellant's contention has reference to the evidence respecting the size of the trees growing upon the land in controversy, and, therefore, that appellant would have us draw the inference that trees of the size described by defendant's witnesses could not have attained such size and growth

unless the lands were wholly of island formation, and had existed for a long period of time. A similar contention was made by the appellants in the case of Bleish v. Rhodes (Mo. Sup.), 242 S. W. 971, 973, wherein the issue tried was whether the land there in controversy was formed by accretion to riparian lands owned by the appellants, Bleish et al., or whether the land had first formed as an island in the Missouri River, as contended by the respondent, Rhodes. Said this Division of this court in that case: "Instruction 5 given for respondent authorized a finding for respondent if the land involved did not accrete to appellants' 'deeded land,' but first formed as an island, and was thereafter joined to the mainland by accretions. The argument against this instruction is that the plats and physical facts conclusively show no island ever formed as contended by respondent. . . . The 'physical facts' now relied upon were in dispute and depended upon oral testimony. Some of the plats and photographs are not in the record. In the circumstances it cannot be held that the record establishes appellants' claim as a matter of law."

We find and hold that there was sufficient and substantial evidence upon which to submit to the jury the theory of the plaintiffs, that the land in controversy was not of island formation, as is contended by defendant and appellant, but that the land was formed by accretion, or by reliction, to the shore lands of plaintiff's grantors. It therefore follows that the trial court committed no error in refusing defendant's peremptory instruction in the nature of a demurrer to the evidence. It was the province of the jury to determine, under all the evidence, including the "physical facts" in evidence, which theory was true, plaintiffs' or defendant's, and the verdict and finding of the jury upon such issue of fact is conclusive and binding upon this court on appeal.

III. Appellant assigns error in the giving of certain instructions to the jury at the request and on behalf of the plaintiffs. Complaint is made of plaintiffs' instruction numbered 1, which reads: "The court instructs the jury that if you find that the land in dispute was not formed as an island or as an accretion to an island, then Atchison County had no title to said land and the quitclaim deed from said county to defendant conveyed nothing." The criticisms urged by appellant against such instruction are (1) that "said instruction eliminates the legal requirement that plaintiffs are required to recover upon the strength of their own title, and not upon the weakness of appellant's title;" and (2) that "said instruction further fails to recognize the fact that if the land in question was the old bed of the Missouri River, and that the said river suddenly abandoned and left said old bed, then,

in that case, said land belonged to Atchison County, and passed by its deed to defendant Johnson.'' With respect to the first criticism leveled against the instruction: As is contended by appellant, the rule of law is well settled that, in statutory actions to quiet title to land, plaintiff must prevail solely upon the strength of his own title, and not upon the weakness of the title of his adversary. Hence, plaintiff in such action must first establish, by his own proof, that he has prima-facie title to the land involved in the action before he is entitled to an adjudication respecting the validity or invalidity of defendant's title thereto; for, if the plaintiff has no valid title, it is no concern of his to know whether or not the defendant's claim of title is valid. [32 Cyc. 1329; Senter v. Lumber Co., 255 Mo. 590, 601; Wheeler v. Land Co., 193 Mo. 279, 291; Parker v. Wear (Mo. Sup.), 230 S. W. 75, 78.] But it was admitted by the parties herein, during the course of the trial, that the plaintiffs have record or paper title to the shore lands lying east of, and adjoining, the old ''high bank'' of the Missouri River, which riparian, or shore, lands are contiguous to the land in controversy. If the land in controversy was formed by accretion or reliction to plaintiffs' ''deeded lands,'' then plaintiffs, by virtue of the aforesaid admission, have shown themselves to have prima-facie title to the land in controversy. Plaintiffs' Instruction No. 1 does not direct a verdict for plaintiffs, and therefore such instruction properly may be viewed and considered as an integral part of all the instructions of the court, taken and viewed together as a single charge to the jury. By Instruction No. 3, also given at request of plaintiffs, the jury were instructed that ''it is admitted in this case that the plaintiffs' grantors owned the land situate on the high bank of the Missouri River, . . . and that the deed introduced in evidence from said plaintiffs' grantors to the plaintiffs conveyed to plaintiffs any right, title, or interest, if any, which said grantors had to the south half of said Section 9 and the north half of said Section 16, and, therefore, if the jury believe from the evidence that the south half of said Section 9 and the north half of said Section 16 was made to and against the land, if any, which had theretofore been made to and against said high bank of said river, by the gradual and imperceptible deposit of earth, sand and sediment accreting to said high bank, or was added to said bank by the gradual receding of the river from said high bank, then your verdict must be for the plaintiffs.'' The court furthermore instructed the jury, at the request of defendant, if they believed that the land in controversy was an island, at and prior to the time of the quitclaim deed of conveyance thereof to the defendant by Atchison County, then the land in controversy belonged to Atchison County, and the said county had the lawful right to convey the land in controversy to defendant, and the

verdict of the jury should be for the defendant, Johnson. Viewing all of the instructions together, as a single and entire charge to the jury, it is apparent that the cause was submitted to the jury upon the theory, adopted and joined by the parties on the trial, that plaintiffs held the record or paper title to the shore lands bordering upon the "high bank" of the Missouri River, which title is extended to the land in controversy if the jury should find and determine that the land in controversy had been formed by accretion, or by reliction, to the shore lands of plaintiffs; but if, on the contrary, the jury should find and determine that the land in controversy was of island formation, or accretions to such island, then Atchison County held the title to the land in controversy at the time of the deed of conveyance to defendant, and the quitclaim deed of Atchison County conveyed the legal title to the land in controversy to defendant. The instructions, when taken and considered as a whole, fairly submitted to the jury the theory adopted by the parties on the trial, and, when plaintiffs' Instruction No. 1 is read and considered as an integral part of all the instructions given to the jury, there is nothing in said instruction which excludes from the consideration of the jury any element or fact which plaintiffs were required to prove in order to entitle them to an adjudication of the title to the land in controversy. As respects the second criticism leveled against the plaintiffs' Instruction No. 1, there is no evidence in the record that the Missouri River, by avulsion, suddenly abandoned and left the old bed of the river adjacent to the east "high bank," by reason whereof the abandoned bed of the river may be said to have belonged to Atchison County at and prior to the time of its deed of conveyance to the defendant. All of the evidence herein was to the effect that the recession of the waters from the old easternmost channel of the Missouri River was gradual and imperceptible, extending over a period of at least two years, or more, and that there was no sudden abandonment of the old channel or bed by the waters of the river. The evidentiary facts herein do not bring the instant case within the principle of law (applicable in cases of avulsion) announced by this court in Cooley v. Golden, 117 Mo. 33, 49, which case is cited by appellant as supporting his criticism of plaintiffs' Instruction No. 1.

Appellant complains that error was committed by the trial court in the giving of plaintiffs' Instruction No. 2, as follows: "The court instructs the jury that there is no evidence of adverse possession by the defendant in this case, and that the only question to be considered by you is whether or not the island in question was formed to the lands owned by plaintiffs' grantors by accretion or reliction, as defined in other instructions." It is claimed that this instruction withdrew from the consideration

of the jury the issue of title by adverse possession, raised and presented by defendant's answer, notwithstanding that defendant had adduced ample and substantial evidence on the trial to establish his plea of title by adverse possession, as against the plaintiffs and their grantors. We have carefully studied and considered the evidence adduced by defendant, and we are of opinion that such evidence is wholly insufficient to establish defendant's plea of title by adverse possession. Obviously, defendant was not in possession of any part of the land in controversy under color of title until February 7, 1918, the date of the execution and delivery of the quitclaim deed from Atchison County, purporting to convey to defendant the land in controversy. It is the general rule, applicable in this and most other jurisdictions, that, in the absence of any statutory requirement, color of title is not a necessary element in order to originate and perfect title by adverse possession. [1 R. C. L. 708; 2 C. J. 172; Quick v. Rufe, 164 Mo. 408, 412; Mather v. Walsh, 107 Mo. 121, 132.] But, in the absence of color of title, the adverse possession of one who claims title by prescription extends only to such part of the land involved, as has actually been occupied and possessed by the claimant, continuously and uninterruptedly, during the whole period of time prescribed by the Statute of Limitations. [Pharis v. Jones, 122 Mo. 125, 130; Davis v. Dawson, 273 Mo. 499, 513; Wilson v. Purl, 148 Mo. 449, 458; Allen v. Mansfield, 108 Mo. 343, 348; Powell v. Davis, 54 Mo. 315, 318; Campbell v. Brown, 146 Mo. App. 319, 324.] There is no clear or certain evidence on behalf of defendant that he was ever in actual possession or occupancy of the particular and described land in controversy. While there is some evidence that cattle and other live stock belonging to defendant were pastured upon the 1000 acres, or more, comprising the so-called "Johnson's island," there is no evidence that such stock were confined by inclosures or fences surrounding that part of the "island" where the land in controversy lies. The testimony of defendant, himself, was that his cattle "ranged back and forth over 1,000 acres." Such evidence is not sufficient to support a plea of title by limitation. [2 C. J. 67; Crain v. Peterman, 200 Mo. 295, 299; Carter v. Hornback, 139 Mo. 238, 245; Nye v. Alfter, 127 Mo. 529, 537.] The evidence is equally hazy and unsubstantial that the clearing and cultivation of the land was extended over the particular 640 acres here in controversy, or that the land in controversy was enclosed by fence until about the time defendant obtained the quitclaim deed of conveyance from Atchison County, in the year 1918. None of the "shacks" or other structures was shown by the evidence to have been erected upon any part of the land in controversy, except the four-room frame house, which was erected in 1919, about a year prior to the commencement of the instant action, and during

the pendency of the several actions, commenced against Atchison County and Adamantine Johnson by plaintiffs' grantors, seeking to quiet the title to portions of the land here in controversy. Viewing the evidence in the light most favorable to defendant, we find that it is wholly insufficient and unsubstantial to show that defendant was in the actual, visible, open and notorious possession and occupancy of the 640 acres of land here in controversy for a continuous period of ten years prior to the commencement of the instant action to quiet title to said land. "If there is no evidence to show adverse possession, the court need not, and should not, submit the question to the jury." [2 C. J. 281, and cases there cited.] The trial court was right in giving plaintiffs' Instruction No. 2, withdrawing from the consideration of the jury, because of the insufficiency of the evidence, the issue of adverse possession of the land in controversy by defendant.

Appellant urges that error was committed by the trial court in giving to the jury plaintiffs' instructions numbered 3, 4 and 6. The said instructions were predicated upon the hypothesis that the land in controversy had been originally formed against the east high bank of the Missouri River by accretion or reliction, and authorized a verdict for plaintiff if the jury should find and believe such hypothesized fact to be true. It is claimed that there is no substantial evidence to support the giving of said instructions. We have held in the preceding paragraph of this opinion that there is ample and substantial evidence to authorize the submission of the issue of fact whether the land in controversy was originally formed to and against the shore lands of the riparian owners by accretion or reliction. Our ruling upon the question of the refusal of defendant's demurrer to the evidence likewise disposes of appellant's claim of error respecting the giving of plaintiff's instructions numbered 3, 4 and 6.

Error is assigned in the giving of plaintiffs' Instruction No. 5, as follows: "Although the jury may believe from the evidence that after an original bar was formed in the river, if you find that a bar was formed therein, and that trees had begun to grow thereon, there was deposited upon said bar, by the waters, earth, sand, and other substances, so as to raise the bar, if you find there was a bar, above the water where it was first formed or made, still this will not prevent the same from being an accretion to the high bank of the river, provided the jury find from the evidence that the bar as originally made was formed against and next to said high bank by the action of the waters gradually receding from said shore." It is claimed that the said instruction is misleading and contradictory in that it permitted the jury to find that the land in controversy was an accretion to the high

bank or shore lands, although the jury might believe from the evidence that the land had originally formed as an island or bar in the river. The criticized instruction is practically identical with an instruction (numbered 3) given on behalf of plaintiff in Chinn v. Naylor, 182 Mo. 583, l. c. 591, wherein the issue tried was whether the land there in controversy was an accretion to the shore lands of plaintiff, or an island originally formed in the Missouri River, as contended by the defendant. The instructions given on behalf of plaintiffs in the instant case are patterned largely after those given on behalf of the plaintiff in Chinn v. Naylor, supra. In the cited case, this court held that the criticism now being urged by the appellant herein against plaintiffs' Instruction No. 5 (which is almost identical with plaintiff's Instruction No. 3 in the Chinn case) is not well founded. Speaking to such criticism, this court said in the Chinn case (182 Mo. l. c. 596 et seq.): ''The instructions under which the issues were submitted to the jury have been set out at length, and are in harmony with the views of this court as expressed in many recent cases (citing authorities). Of these instructions, but one for the plaintiff is criticized, and that is instruction numbered 3 by which, it is contended for the defendant, the jury were authorized to find that the land in controversy was an accretion to the north shore, although they may have believed from the evidence that it first formed as an island or sand bar out in the river. The criticism on this instruction is not well founded; the direction therein is wholly predicated of a bar which the jury are required to find was originally formed against and annexed to the north shore, and when read in connection with the other instructions, and applied to the evidence, could not possibly have misled the jury in the manner indicated.''

We find no reversible error to have been committed by the trial court in giving to the jury any of the instructions criticized by the appellant herein.

IV. It is furthermore contended by appellant that the trial court erred in failing to instruct the jury to apportion the accretions, and to direct the jury as to the manner of such apportionment. We perceive of no reason why the trial court should have directed an apportionment of the accretions. Neither the plaintiffs nor the defendant, by their respective pleadings or instructions, claimed a *part only* of the accretions, or prayed for any division or apportionment thereof. Each of the respective parties claimed, and now claims, the *whole* of the land in controversy. An instruction upon the apportionment of the accretions has no place in the present case, under the pleadings or the evidence. [Crandall v. Allen, 118 Mo. 403, 413.] Moreover, the

276

defendant will not be heard to complain upon appeal when he made no claim to any proportionate part of the accretions on the trial below, by way of pleading, evidence or requested instructions. [Naylor v. Cox, 114 Mo. l. c. 242, 243.]

V. Defendant, upon the trial, offered in evidence two maps of Atchison County, namely, S. S. Hughes's map for the year 1877, and Rummerfield's map for the year 1894. Upon objection of the plaintiffs, the trial court refused to receive the proffered maps in evidence, and error is assigned in such ruling and action of the court. So far as the record discloses, both of the proffered maps were unofficial and private maps. The accuracy, correctness, and authenticity of the maps was not undertaken to be shown by the defendant, and the maps were proffered by defendant solely as *independent documentary evidence* in the cause. The maps were not, in and of themselves, evidence of their own correctness and authenticity. [Miller v. Halleran, 219 Mo. App. 195, 208.] Nor were the maps shown to be original documents, they apparently being merely printed copies of the originals, and the purported makers of the maps were not shown to have made them while acting in any official capacity; wherefore, the law relating to the admission in evidence of ancient documents has no application to such instruments. [Bell v. George, 275 Mo. 17, 34.] In our opinion, the proffered maps were not competent as independent documentary evidence in the cause, and the trial court committed no error in rejecting them. [Stewart v. Land Co., 200 Mo. 281, 290; Stumpe v. Kopp, 201 Mo. 412, 418; Carter v. Hornback, 139 Mo. 238, 242; Williamson v. Railway Co., 115 Mo. App. 72, 76.]

VI. During the argument of the cause to the jury, the following statement was made by plaintiffs' counsel: ''Gentlemen, I am willing to end this case right now. I am willing to make a proposition to these gentlemen on the other side. Dr. Johnson (defendant) testified he saw that tree from which that block was cut on that island in 1881. I am willing to submit this case on this right now. Let the jury take that block, and if they can count forty-five rings on it, bring in a verdict for the defendant, and if not, bring in a verdict for the plaintiff.'' Whereupon, defendant's counsel said: ''We are not agreeing to anything, and we object to the statement of the attorney.'' The court then ruled: ''Argue the evidence and let the jury draw the conclusions.'' Defendant excepted to the aforestated ruling of the court.

It is urged by appellant that the foregoing statement and argument of plaintiffs' counsel was highly improper and prejudicial, and constitutes reversible error. Assuming that the argument of

plaintiffs' counsel was improper, as is contended by appellant, yet we find no reversible error in the ruling of the trial court, which was to the effect that counsel must argue only upon the evidence and let the jury draw their conclusions from the evidence. In effect, the ruling of the court was in the nature of a mild rebuke to plaintiffs' counsel, and an admonishment or direction to the jury to disregard counsel's argument as being outside of the evidence. Defendant's counsel did not ask the trial court to further reprimand or rebuke the offending counsel, but was content merely to except to the aforestated ruling of the court. We cannot convict the trial court of reversible error with respect to such ruling, upon the record before us. [Busse v. White (Mo. Sup), 274 S. W. 1046, 1049; Dittmeier Real Estate Co. v. Southern Surety Co. (Mo. Sup.), 289 S. W. 877, 890; Torreyson v. United Railways Co., 246 Mo. 696, 706.]

We have given careful and thorough consideration to the several assignments of error made by appellant, and we find no reversible error to have been committed upon the trial below. It follows, therefore, that the judgment of the circuit court should be affirmed, and it is so ordered. *Lindsay* and *Ellision*, *CC.*, concur.

PER CURIAM:—The foregoing opinion of SEDDON, C., is adopted as the opinion of the court. All of the judges concur.